UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:18-CR-60-D1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Government Memorandum in Aid |
| v. | ) | of Sentencing |
| | ) | |
| PHIL CAPRICE HOWARD, | ) | |

The United States of America, by and through the United States Attorney for the Eastern District of North Carolina, respectfully submits this memorandum in aid of sentencing for Phil Caprice Howard ("Defendant"). Defendant engaged in a conspiracy to smuggle cut-rag tobacco into Canada, resulting in a loss to the Canadian government of $790,669,588.50 in Canadian dollars or approximately $686 million in United States dollars. He also failed to report the income he received from the scheme, as well as other income he received, on both his federal and state tax returns, resulting in a tax loss to the United States of over $1 million.

Defendant's smuggling scheme continued for nine years, even after repeated warnings that he and his associates were drawing the attention of law enforcement. Defendant was not deterred by notification that a similar smuggling scheme was the subject of a law enforcement bust, by the execution of a search warrant at a close co-conspirator's business, or by learning that a grand jury was investigating one of his business associates. Instead, Defendant lied to that grand jury, and continued with his scheme. Indeed, Defendant was even undeterred by the charges in the instant case, as he continued to file false tax returns even after his arrest.

For these reasons, and as discussed more fully herein, the government respectfully submits that a sentence at the high end of the advisory Guidelines range of 97 months' imprisonment is sufficient but not greater than necessary in this case, taking into consideration all of the relevant § 3553(a) factors. *See* 18 U.S.C. § 3553(a). The government further recommends that the Court order Defendant to pay restitution to the IRS in the amount of $1,062,192, for 10 years' worth of delinquent taxes.

## I.       **PROCEDURAL BACKGROUND**

On November 15, 2018, Defendant was indicted under seal. [D.E. 6]. He was arrested on January 17, 2019 and released pending trial on January 23, 2019. [D.E. 14, 25]. Defendant's conditions of pretrial release required that he not violate any federal, state, or local law. [D.E. 26].

On April 10, 2019, Defendant was charged by second Superseding Indictment with three counts of willful failure to file tax returns, four counts of willfully filing false tax returns, two counts of making false material declarations before a grand jury, one count of conspiracy to commit wire fraud, and nineteen substantive counts of wire fraud. [D.E. 38]. On October 31, 2019, Defendant was arraigned on the second superseding indictment. [D.E. 58]. At that time, the government argued that Defendant was violating the terms of his supervised release by failing to pay taxes due and owing for the uncharged 2017 and 2018 tax years. [D.E. 58]. The Court ordered Defendant to pay the taxes within 30 days. [D.E. 58].

Trial was ultimately set for October 19, 2020. On October 6, 2020, pursuant to

a written plea agreement, Defendant waived indictment and pled guilty to a Superseding Criminal Information charging him with one count of conspiracy to commit money laundering and one count of willfully filing a false 2014 individual income tax return. [D.E. 79]. Sentencing is set for May 20, 2021. [D.E. 99].

## II.    FACTUAL BACKGROUND

### A.    The Scheme to Smuggle Cut-Rag Tobacco into Canada

Defendant was an integral part of a conspiracy to smuggle more than 6 million pounds of cut-rag tobacco from North Carolina into Canada, resulting in a tax loss to Canada of approximately $790,669,588.50 in Canadian dollars.[1] See Exhibit A. Defendant acted as a broker, purchasing cut-rag tobacco from warehouses in North Carolina and selling it to smugglers on the Akwesasne Reservation, a Mohawk Nation territory that straddles the border between the United States and Canada.

Defendant took steps to conceal his purchase of cut-rag tobacco, including by using intermediary companies operated by third parties to buy the tobacco, and by having others provide payment to those intermediary companies on his account.

Once Defendant purchased the tobacco, truck drivers picked it up at warehouses in North Carolina and transported it to locations on the Akwesasne Reservation. There they were met by smugglers, as well as a crew of baggers that repackaged the tobacco from boxes into garbage bags. The smugglers then used boats or snow mobiles to transport the bagged tobacco across the St. Lawrence River and

---

[1] Notably, this tax loss figure is based only on the loads for which Defendant was the broker and does not include the substantial loss resulting from Defendant's co-conspirators' additional smuggling activities.

3

into Canada.[2] The smugglers paid others, including members of the Hell's Angels motorcycle gang, to transport the bagged tobacco from the St. Lawrence River shoreline to the Kahnawake Reservation, a Mohawk Nation territory in Quebec, Canada, where the tobacco was sold to the end buyer. Ultimately, the cut-rag tobacco was processed into contraband cigarettes, the sale of which funded organized crime elements that engaged in drug trafficking in the United States. Exhibit B to this sentencing memorandum lays out the way in which the money flowed as part of this scheme.[3]

Defendant received payment for the cut-rag in the form of cash, contraband cigarettes, and wires into his bank account, and concealed his receipt of each form of payment. Most commonly, the truck drivers brought bags of cash back to North Carolina to deliver to Defendant when they went to pick up another load of cut-rag tobacco. Defendant used code words for money and cigarettes when speaking with the truck drivers in order to avoid detection, and told them to lie to law enforcement if they were pulled over and questioned about why they had tens of thousands of dollars of cash in their truck.

Defendant also received payment in the form of contraband cigarettes, likewise hauled back by the truck drivers. To conceal his connection to these cigarettes, Defendant ensured that the truck drivers used false bills of lading, indicating that

---

[2] Witnesses recounted that Defendant was interested in cutting out the smuggling middleman and selling directly to buyers in Canada. However, it does not appear he was able to accomplish this goal.

[3] A Canadian news channel aired a 2018 exposé on schemes like the one in which Defendant was engaged, which clearly explains the way the schemes operated. The most relevant part of the video begins at 15:00, and is available at https://youtu.be/4nJLuXVizaY.

the cigarettes were headed to a location unrelated to the scheme.

Finally, Defendant received payment in the form of wires. On the rare occasions when Defendant was paid directly by wire, to conceal the nature and source of the payments, the wire transfers were transmitted by individuals who were not a part of the smuggling conspiracy. These individuals were paid to send the wires in their own names or business names to Defendant, using funds provided to them by Defendant's co-conspirators.

While Defendant's actions as a broker form the core of this case, he also played a small role with respect to a related smuggling operation managed by CD3, the owner and operator of two of the intermediary companies through which Howard purchased cut-rag tobacco. In addition to selling Defendant cut-rag tobacco, CD3 operated as a broker in a scheme similar to the one Defendant operated. On numerous occasions, Defendant picked up cash from truck drivers on CD3's behalf and delivered the cash to CD3, a task for which he was paid approximately $100 per delivery. The loads CD3 sold as part of this separate scheme are not included in the calculations in this sentencing memorandum.

## B. Defendant's False Tax Returns and Failure to File Tax Returns

Defendant was engaged in the cut-rag tobacco smuggling scheme in 2010 and from 2012-2018. Nevertheless, he failed to report the existence of that business on tax returns for those years. He also earned substantial income from additional sources, including farming income, which he failed to report as required for 2008 and 2010-2018. The Presentence Investigation Report (PSR) calculates the tax loss at

$1,066,554, and neither party objected to that finding. [D.E. 91, 92]. While Defendant did not object to the PSR's calculation of tax loss, defense counsel has advised the government that they intend to contest the tax loss amount at sentencing.

The tax loss calculations do not affect the Guidelines, because both parties agree the relevant tax loss is between $550,000 and $1.5 million for Guidelines purposes. However, the final tax loss calculation is important in this case because Defendant has agreed to pay restitution to the IRS in the amount of all tax due and owing by him for tax years 2008 and 2010-2018, as determined by the Court at sentencing, together with interest on that amount.

"The government bears the burden of establishing the tax loss by a preponderance of the evidence." *United States v. Mehta*, 594 F.3d 277, 282 (4th Cir. 2010). In calculating a tax loss, the Court need only make a reasonable estimate based on available facts, and may rely on information that would not be admissible at trial, so long as the information is sufficiently reliable. *Id.* As laid out in more detail below, the $1,066,554 was properly determined by first calculating all known gross receipts Defendant received, and then giving him credit for all known business expenses he incurred.

i.  <u>Defendant's Gross Receipts</u>

The majority of business income Defendant received from 2008-2018 was from the illegal cut-rag tobacco scheme outlined above. Defendant did not maintain accurate business records regarding this criminal activity. Indeed, he was

subpoenaed for records and provided little in response. Therefore, the government relied upon records obtained from the companies that sold him cut-rag tobacco, which show that he purchased 6,702,743 pounds in 2010 and 2012-2019. See Exhibit D. Defendant did not possess a license to manufacture cigarettes, and there is no evidence that he manufactured any cigarettes; therefore, this total also reflects the amount of cut-rag tobacco that he sold.

At issue, then, is at what price Defendant re-sold the cut-rag tobacco. Based on reliable information gathered during the investigation, including statements from co-conspirators who entered guilty pleas before Defendant and who were prepared to testify against Defendant, Defendant re-sold the cut-rag tobacco at prices ranging from $2.70/lb - $3.15/lb.

CD1 stated that he bought cut-rag tobacco from Defendant at a price between CAN$110,000 and CAN$130,000 per 31,680-pound load. Records from New Duplin warehouse and wire transfers from individuals associated with CD1 to Defendant corroborate CD1's information that he purchased cut-rag from Defendant. Using the most conservative possible calculation and applying the highest annual exchange rate during the time period in which CD1 purchased cut-rag from Howard, 1.1045 Canadian dollars per United States dollar, and the lowest price CD1 recalls paying (CAN$110,000) results in a sales price of at least US$99,953 per load of tobacco sold to CD1, or US$3.15/lb.[4]

---

[4] If, instead, the government used the lowest average annual exchange rate (.9891 Canadian dollars per United States dollar), and the highest price CD1 recalled paying, the price per load would be $131,432.62, or about $4.15/lb.

Another cooperating defendant ("CD2") operated as a smuggler on the Akwesasne Reservation and indicated that he paid on average approximately US$2.70 per pound for cut-rag tobacco from 2010-2018, or about US$85,536 per 31,680-pound load. Finally, truck driver Daryl B. Smith said that he counted the cash that he hauled back to Defendant from the Akwesasne Reservation and determined that the amount was US$96,870 per load, or $3.06/lb.

Accordingly, it appears that Defendant sold 6,702,743 pounds of cut-rag tobacco at anywhere from US$2.70/lb - $3.15/lb.[5]

Defendant's other gross receipts are more easily identified, as he received funds for the sale of corn, wheat, leaf tobacco, and excavation work that can be readily established through business records. Exhibit C provides a summary of the gross receipts Defendant received in each year from sources other than cut-rag tobacco sales.

## ii. Defendant's Expenses and Tax Loss Calculations

Again, because Defendant provided almost no business records in response to a subpoena, calculating Defendant's expenses in each year, and therefore the resulting tax loss, is somewhat complicated. The Sentencing Guidelines note that, where Defendant filed a false tax return, here tax years 2008 and 2014-2018, the tax

---

[5] While Defendant received wire transfers as payment or partial payment for the cut-rag, it is generally not possible to match up loads with the wire transfers. For example, on one occasion Defendant received $111,540 in a single wire, which exceeds the amount Defendant received for a given load, and likely therefore reflects payment for one load plus partial payment for another. Other wires were for amounts that were far lower than what Defendant paid for a load, and therefore clearly reflect only partial payment. Still, there are some transactions that appear to match up with single loads. For example, on one day Defendant received $97,225.28 broken out in three wires from individuals associated with CD1, which appears to line up well with the price CD1 reports having paid Defendant for a load.

8

loss shall be treated as equal to 28% of the unreported gross income, unless a more accurate determination of the tax loss can be made. USSG §2T1.1(c)(1)(A). For the tax years 2010-2013, where Defendant did not file a return, the tax loss is 20% of the gross income, unless a more accurate determination of the tax loss can be made. USSG §2T1.1(c)(2)(A).

The government's proposed calculations proceed in two steps.[6] First, the government created a corrected tax return for Defendant for each year, listing gross receipts for which the corresponding expenses can reasonably be estimated, along with those expenses, and determining the accordant tax loss. Second, the government multiplied the remaining unreported gross income by the applicable percentage as directed by the Sentencing Guidelines. Exhibit F to this sentencing memorandum shows the applicable tax loss calculations for each year, with the second and third column showing the tax loss associated with step one and the fourth and fifth columns showing the tax loss associated with step two. The fifth column shows the total tax loss, matching the amount listed in the PSR.

a.  *Step One of Tax Loss Calculations*

There are two types of income Defendant received for which the expenses, and therefore, the accompanying tax loss can reasonably be estimated: (1) sale of soybeans to an unindicted co-conspirator/target with initials "R.R." and (2) sale of

---

[6] The government intends to present two witnesses at the sentencing hearing: a special agent who will explain and summarize the relevant evidence regarding where the numbers underlying the government's calculations come from and a revenue agent to explain how those numbers were applied in calculating the tax loss. This memorandum serves to summarize the expected testimony to provide a framework that will hopefully streamline the testimony at the hearing.

9

cut-rag tobacco.

With respect to the sale of soybeans, Defendant testified before the grand jury that he made $74,400 in 2014 and $62,000 in 2015 *after expenses*. Taking Defendant's statements under oath at face value, then, the calculations are easy enough, with net income from sales of soybeans of $74,400 in 2014 and $62,000 in 2015. With respect to Defendant's cut-rag business, the nature of Defendant's position as a broker means that he only had two possible expenses, the amount he paid for the cut-rag tobacco and any amounts paid to the truck drivers. Each of the companies that sold Defendant cut-rag tobacco maintained full and complete business records of the pounds and price charged for any sale to Defendant. Adding up those invoices results in the pounds purchased and total cost of goods sold listed in Exhibit D, with totals for 2010-2018 of 6,671,063 pounds purchased by Defendant for a total price of $15,622,256.93, or about $74,188 per load and approximately $2.34/lb.[7]

All that's left then to determine Defendant's profit from cut-rag tobacco sales is to combine the testimony regarding the price at which Defendant sold his cut-rag tobacco to the price he paid for it.[8] As discussed above, CD1's statements suggest he paid a minimum of $99,593 per load of tobacco he purchased from Defendant. CD1

---

[7] This is generous to Defendant in that it gives him credit for expenses when he incurred them (the accrual method) rather than when he actually paid them (the cash method). Quickbooks records from CD's business, one of the intermediary companies Defendant used to purchase tobacco, show that Defendant did not fully pay all of his invoices and therefore may not have incurred the full cost of goods sold listed here.

[8] Using the value of the cigarettes Defendant received to determine the price he received for cut-rag tobacco is not a feasible alternative. It appears Defendant often received cigarettes in addition to cash, meaning that the cigarettes shipped to him represented only a partial payment for a load.

indicated that he, not Defendant, paid the truck drivers, meaning Defendant had no expenses beyond the $74,188 per load he paid to purchase the tobacco, leading to an estimated profit per load of about $25,000 to Defendant.

CD2 indicated he purchased the tobacco for $85,536 per load and that he, too, paid the truck drivers on loads he purchased from Defendant, leaving Defendant an estimated profit of $11,000 per load. Daryl B. Smith indicated that Defendant received $96,870 per load, but that, on those loads, Smith was paid $3,400 per load by Defendant, not by the smuggler. Giving Defendant credit for paying Smith $3,400 per load, plus an additional $1,000 per load for cash delivery, results in a profit per load to Defendant of over $18,000.

As such, Defendant's profit ranged from $11,000-$25,000 per load. To be conservative, the government has estimated that Defendant earned 33 cents per pound throughout the conspiracy, or $10,454.40 per load, less than any of these estimates. In addition to being supported by the figures provided by Defendant's co-conspirators, this estimate lines up with estimates provided by others in the smuggling business. CD2 estimated that brokers like Defendant generally made between $9,000 and $15,000 per load. CD3 estimated that he made $5,000-$10,000 per load in his own parallel scheme. Another broker who is cooperating with law enforcement estimated the profit per load at $8,000-$12,000.

The government's calculations are therefore grounded in testimony from multiple credible sources and reliable business records and comport with testimony regarding industry standards for the amount of profit Defendant could have

expected to earn.

b. *Step Two of Tax Loss Calculations*

With respect to the income Defendant received for goods other than cut-rag and soybeans sold to Target R.R., it is impossible to reasonably estimate Defendant's associated expenses because he failed to report the relevant income and expenses on his tax returns and maintained no records regarding the expenses. Accordingly, as directed by USSG §2T1.1(c), Step Two only requires a simple calculation: taking all gross receipts Defendant received from sources other than his sale of soybeans to Target R.R. and his cut-rag tobacco business and multiplying it by 20% in years in which he did not file a return and 28% in years in which he did file a return.

In total, Defendant's tax loss is estimated at $1,066,554.[9] See Exhibits E and

---

[9] This tax loss potentially underestimates Defendant's tax due and owing for at least four reasons. First, as discussed above, the government used a profit margin per pound from Defendant's smuggling business that is lower than the estimates that would be calculated using the numbers provided by any of the three co-conspirators who provided figures regarding Defendant's income and expenses. Second, the estimate is conservative in that it counts as expenses incurred by Defendant's cut-rag business the full amount that business records show Defendant was *invoiced*, rather than the lower amount that it appears he actually *paid*. Also, with respect to expenses, the government's calculations are generous in that they give Defendant credit for all the expenses he claimed on his filed returns, even though he has presented no records supporting those expenses. For reference, if Defendant were subject to civil audit, these expenses would be disallowed, he would not get the benefit of the Guidelines' 20%/28% rule, and the total tax loss would be calculated at $1,448,152, as laid out in Exhibit G.

Third, Defendant received 132,360 cartons of contraband cigarettes as partial payment for cut-rag tobacco, with an estimated street value of about $3/pack or almost $4 million overall. Presumably, he was only willing to accept these as payment in lieu of cash because he could make further profit on their sale. However, because the government limited its calculation of non-cut-rag income to gross receipts for which either Defendant testified to the amount in the grand jury or the government had a bank or business record supporting the transaction, and there were no such records related to Defendant's sale of contraband cigarettes, no income from Defendant's sales of contraband cigarettes are included in these calculations.

Fourth and relatedly, Defendant received approximately $100 per delivery for delivering cash to CD3 as part of CD3's parallel smuggling scheme. While it appears Defendant did this dozens of times, it is not clear exactly how many times he delivered the cash and exactly what his fee was. Again, because there are no checks or wires showing the amounts CD3 paid Defendant, any income from his delivery of cash to CD3 has not been included in these calculations.

Case 4:18-cr-00060-D   Document 100   Filed 05/06/21   Page 12 of 26

F. Exhibit E lays out a comparison of the gross receipts Defendant received with the gross receipts Defendant reported, which underlies the calculations in Exhibit F.

### C. Other Misconduct

Defendant's state tax filing history closely mirrors his federal filing history. He failed to file state individual income tax returns as required for tax years 2008 and 2010-2013 and filed false state income tax returns with numbers matching those on his federal income tax returns for 2014-2018. As a result, North Carolina suffered a loss in excess of $150,000.

Defendant also evaded excise taxes. As discussed above, he received contraband cigarettes as payment for cut-rag tobacco. According to the bills of lading maintained by the truck drivers, they transported 132,360 cartons of contraband cigarettes to Defendant. At Defendant's request, these bills of lading contained false information regarding their destination to conceal Defendant's involvement in the scheme. Defendant's sale of these contraband cigarettes without paying the applicable excise taxes resulted in an estimated tax loss of $595,620 to North Carolina.

Defendant also engaged in additional misconduct to conceal his scheme. On March 10, 2016, he testified before a federal grand jury as part of an investigation into potential crop insurance fraud. At that time, Defendant denied the existence of a burner phone, which he used to conduct his smuggling business[10], and denied that

---

[10] Defendant used the burner phone to attempt 441 calls between himself and the target of the grand jury investigation in the year and a half preceding his testimony and made thousands of additional calls on the burner phone as part of the tobacco smuggling conspiracy.

he had any income source other than farming and money he received from the target of the investigation, which therefore concealed the existence of his tobacco smuggling business.

Defendant also failed to comply with reporting requirements, again as part of his attempts to conceal his engagement in the cut-rag tobacco smuggling scheme. In late 2015, CD3 learned of the requirement that individuals who receive more than $10,000 in cash in a trade or business file Forms 8300 reporting such cash receipts. When he alerted Defendant to this requirement, Defendant said he did not want the reports filed, and the two agreed to restructure their transactions, which formerly relied upon cash payments from Defendant to CD3, to include wire payments directly to CD3 from Defendant's buyer. Shortly thereafter, Defendant stopped doing business with CD3. While Defendant received tens of thousands of dollars in cash at a time on numerous occasions during the operation of the conspiracy, he never filed a Form 8300 reporting his receipt of the cash.

Defendant also structured transactions to avoid the filing of Currency Transaction Reports ("CTRs"). For example, in October 2011, Defendant received two large checks that he converted into smaller checks he could cash without causing the issuance of CTRs. Defendant converted the first check, in the amount of $65,272, into 7 official checks in the amount of $9,250, with the remainder being allocated to a regular check to himself. He then cashed the checks on October 17, 18, 19, 19 (again), 20th, and November 1. Defendant converted the second check, for $98,755, into nine matching $9,900 official checks, with the remainder being cash Defendant

took out (also less than $10,000). Defendant then cashed the checks on October 19, 25, and 31, and November 2, 3, 4, 7, 8, and 9.

Finally, while not a separate crime in and of itself, it warrants mentioning that Defendant served as the third-party custodian for his brother while his brother was on pretrial release in 2015. Defendant did not just continue to commit crimes while he was supposed to be supervising his brother, *he brought his brother with him* while he went to collect and distribute cash as part of the conspiracy. (PSR at 9-10).

## III.   <u>RESTITUTION</u>

Defendant agreed in the plea agreement to "make restitution to any victim including any victim with respect to a count dismissed as part of the agreement in whatever amount the Court may order . . . ." [D.E. #82 at 1]. Specifically, he agreed "to pay restitution to the [IRS] in the amount of all tax due and owing by him for tax years 2008 and 2010 through 2018, as determined by the Court at sentencing . . . ." [D.E. #82 at 1]. The government agrees with the restitution amount of $1,062,192 laid out in the PSR. This amount is equal to the total tax loss of $1,066,554 laid out in Exhibit F, less $4,362 Defendant has paid towards his 2011 tax liability. The government asks that the Court make reference in the judgment to the specific tax loss amounts for each year for which Defendant is ordered to pay restitution, so that the IRS knows how to apply Defendant's payments. If the Court accepts the numbers in the PSR, these figures will simply be the far-right column from Exhibit F, with the exception that the number for 2011 will be $48,323, to account for Defendant's

previous $4,362 payment.

As laid out in the government's objection to the PSR, the government does not believe the Court has statutory authority to order restitution to the state of North Carolina in this case. However, plainly, Defendant has caused a sizeable tax loss to the state. The government recommends the Court include, as a condition of Defendant's supervised release, that he file correct 2008 and 2010-2018 state individual income tax returns and pay the resulting taxes due and owing, plus any applicable penalties and interest, and make a payment of $595,620 to the state of North Carolina for the unpaid excise taxes for the contraband cigarettes.

## IV.    UNITED STATES SENTENCING GUIDELINES

With respect to the money laundering offense, the parties agree with the PSR that the value of laundered funds is between $1.5 and $3.5 million, resulting in an offense level of 24; a two level upward adjustment is warranted because the Defendant was convicted under 18 U.S.C. § 1956; a two level upward adjustment for willful obstruction is appropriate, and a two level adjustment for aggravating role is also warranted, resulting in an offense level of 30.

With respect to the tax offense, the parties agree that the loss amount is between $550,000 and $1.5 million, resulting in a base offense level of 20; a two level enhancement is warranted because Defendant failed to report more than $10,000 in income from criminal activity in a given year, and a two level enhancement is warranted for willful obstruction, resulting in an offense level of 24.

Applying a one level enhancement to the money laundering offense level

because the two offenses do not group, and subtracting three levels for acceptance of responsibility results in a Guidelines range of 78-97 months.

The sole disagreement between the parties and the PSR relates to the tax loss. The PSR suggests that, in the absence of a plea agreement, the tax loss would be in excess of $1.5 million because it includes, as relevant conduct, the excise taxes North Carolina did not receive with respect to contraband cigarettes Defendant sold to retail establishments for resale. The government agrees with the PSR that Defendant sold contraband cigarettes, for which no excise taxes were paid, and that the resulting tax loss is approximately $595,620, as the PSR notes. However, as noted in its objection to the PSR, the government does not agree that this tax loss should be included as relevant conduct with respect to Defendant's own false individual income tax return.

## V.    18 U.S.C. SECTION 3553(a) FACTORS

After making the initial Guidelines calculation, a sentencing judge must take into consideration the relevant factors set forth in 18 U.S.C. § 3553(a) to fashion "a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). The Guidelines themselves "embody the § 3553(a) considerations, both in principle and in practice" and "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007). Thus, "a sentence within a properly calculated advisory Guidelines range is presumptively reasonable." *United States v. Montes-Pineda,* 445 F.3d 375, 379 (4th Cir. 2006). The government urges the Court to impose a presumptively

17

reasonable sentence within the advisory Guidelines range of 97 months of imprisonment as such a sentence is necessary and appropriate to meet the ends of Section 3553(a).

### A.    Nature and Circumstances of the Offense

The amount of loss Defendant has caused is almost unfathomable, with the figures totaling a loss of more than $790 million in Canadian dollars to the Canadian government, a loss of more than $1 million to the United States government, and a loss of more than $500,000 to the state of North Carolina. Again, the loss to the Canadian government listed here is only the loss from the loads for which Defendant was the broker, and does not include any of the additional loss caused by interrelated parts of the conspiracy.

The scope of the financial impact of Defendant's crimes is therefore vast, which explains why he was facing a Guidelines sentence of life imprisonment before he pleaded guilty, but it does not tell the full tale of the harm he caused. The smuggling of cut-rag tobacco is not a victimless crime. The smuggled tobacco is used to manufacture contraband cigarettes, which cause harm to consumers because the ultimate product is not regulated. This means that smokers of the contraband cigarettes are at greater health risk, because the cigarettes may include materials beyond tobacco or may not match regulatory filtering requirements. *See* Department of State, *The Global Illicit Trade in Tobacco: A Threat to National Security*, https://2009-2017.state.gov/documents/organization/250513.pdf at pg. 2. Smokers of the contraband cigarettes are also at greater risk of causing potentially deadly fires,

18

since contraband cigarettes do not contain fireproof mechanisms contained in regulated cigarettes. Paula Duhatschek, *Contraband cigarettes linked to a 'staggering' number of fires*, CBC https://www.cbc.ca/news/canada/london/contraband-cigarette-fires-london-1.4769037 (noting that there were 17 fires in one Canadian city in the first seven months of 2018 related to contraband cigarettes, causing two serious injuries and $1.6 million in damages).

Of course, the sale of contraband cigarettes also harms legitimate cigarette manufacturers, since their sales are substantially diminished because they cannot afford to sell at the same price as sellers who are not paying the sizeable taxes. The problem of contraband tobacco is not a small or isolated one, with a 2010 paper estimating that contraband tobacco constitutes more than a quarter of the overall Canadian tobacco market.[11]

Americans are not immune to the after-effects of the smuggling operation. The primary beneficiaries from cut-rag smuggling are the organized crime elements behind much of the activity. For example, Hell's Angels, the Russian mafia, and the Italian mafia, organizations involved in drug trafficking in the United States, have all been found to be involved in the contraband cigarette market in Canada, including by charging "taxes" on cut-rag tobacco brought onto Reservations and by fronting the money for entire smuggling operations.

Defendant was therefore an important player in a scheme that not only caused

---

[11] *Contraband Tobacco in Canada: Tax Policies and Black Market Incentives*, https://www.fraserinstitute.org/sites/default/files/contraband-tobacco-in-canada.pdf.

huge losses to his own state and country and to the Canadian government, but also put money in the pockets of organized crime and presented health and safety dangers to everyday Canadians. Defendant also sold contraband cigarettes in the United States, presenting those same health and safety dangers to everyday Americans and causing losses to North Carolina's licensed cigarette manufacturers.

While Defendant was not actively engaged in smuggling the tobacco across the border himself, it was not for lack of trying, as he sought information from his co-conspirators about how to get a load across the border without using a middleman smuggler. Defendant still played an important role in the scheme, both by providing the pivotal connection between tobacco warehouses in North Carolina and the smugglers on the border, and by directing the involvement of the various truck drivers involved in the scheme.

Defendant's culpability is heightened by his efforts to conceal his involvement in the scheme: his use of code words with the truck drivers and instructions to them to lie if they were pulled over, his failure to file Forms 8300 and his structuring activity, and, worst of all, his lies to a federal grand jury. Defendant is also worthy of additional punishment because he continued to engage in the cut-rag smuggling scheme while he was the third-party custodian for his brother.

Defendant benefitted substantially from his crimes, making millions of dollars over the course of a decade, even before accounting for any profits he made from his sale of contraband cigarettes in North Carolina. He then failed to report these profits on his state and federal income tax returns, causing sizeable losses to his state and

20

country. Defendant has engaged in a long and serious string of crimes, through which he has caused harm resonating across two countries. The nature and circumstances of the offense demand a sentence at the high end of the Guidelines range.

### B.    History and Characteristics of the Defendant

Nothing in Defendant's history and characteristics mitigates the seriousness of his crimes. Defendant's crimes were not aberrant behavior or a youthful indiscretion. He consciously chose to continue his crimes over the course of a decade, including after being placed in a grand jury, after being charged in this case, and after being directed not to commit further crimes while on pre-trial release.

Defendant's history also makes clear that the sole motivator for his crimes was greed. He has marketable skills in farming, heavy equipment operations, and welding, and was able to earn almost $100,000 in a year from operating a farm. (PSR at 15). Plainly, he is and has been capable of earning an honest living. Instead, however, he chose, again and again over the course of a decade, to engage in a criminal scheme from which he profited substantially.

### C.    General Deterrence

General deterrence is of particular importance both with respect to Defendant's cut-rag smuggling scheme and his tax fraud scheme. First, a significant sentence is necessary to deter others from engaging in the smuggling of cut-rag tobacco. In response to the vastness of the smuggling problem, task forces specifically related to the issue have been created in both Quebec and Ontario, and at the federal

Canadian level. In the past ten years, those law enforcement officials have conducted at least four major busts of smuggling rings. In each of those cases, the contraband tobacco involved originated in North Carolina. In other words, North Carolina is the primary source of Canada's contraband tobacco problem. While Canadian cases have been brought against the truck drivers, these cases have made little impact, since a new truck driver can readily be found to drive the route across the border. As in narcotics cases, cutting off the source is essential to stopping the flow of contraband cut-rag tobacco into Canada. A sizeable sentence is therefore necessary to deter would-be brokers from selling North Carolina tobacco to smugglers.

Second, a serious sentence in this case is necessary to deter those involved in interrelated crop insurance fraud schemes. As the Court well knows, fraudsters underreport the amount of tobacco they grew in order to claim entitlement to crop insurance benefits. The question in those cases is frequently what the fraudsters do with the unreported tobacco. This case answers that question – much of the tobacco ends up being smuggled into Canada. So far, the sentences in the crop insurance fraud cases have not been sufficient to deter farmers from engaging in the fraud. Here, a lengthy sentence of imprisonment is necessary to send a message that individuals who are involved in any step of this scheme will receive serious punishment.

Third, a lengthy term of imprisonment is necessary to provide deterrence with respect to the tax crimes at issue in this case. The Sentencing Guidelines have emphasized that deterrence is a primary consideration in sentencing defendants

convicted of violating the tax laws. USSG, Ch. 2, Pt. T, intro. comment. Indeed, as the Fourth Circuit has noted, sentences of imprisonment are vital in tax cases:

> Given the nature and number of tax evasion offenses as compared to the relatively infrequent prosecution of those offenses, we believe that the Commission's focus on incarceration as a means of third-party deterrence is wise. The vast majority of such crimes go unpunished, if not undetected. Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.

*United States v. Engle*, 592 F.3d 495, 501 (4th Cir. 2010). An additional term of imprisonment is therefore necessary and appropriate, above and beyond whatever sentence the Court would provide if Defendant had only engaged in the cut-rag tobacco smuggling scheme, to show that those who violate the tax laws face real consequences for doing so.

### D.   **Specific Deterrence**

While Defendant does not have any scoring criminal history points, the evidence in this case suggests that he requires a lengthy sentence to provide adequate deterrence. In May of 2014, Defendant received a text message from CD3 telling him about a recent bust of a cut-rag tobacco smuggling operation. Defendant, however, was undeterred, explaining to CD3 that his customers were not caught in the bust and that he would keep conducting the scheme. In March of 2016, Defendant got another warning that he could be caught and face serious consequences for his involvement in the scheme – a search warrant was executed at CD3's home and business. Rather than shut down his own smuggling business, Defendant met CD3 in a parking lot, where they each lifted up their shirts to prove

they were not wearing a wire and discussed the case. Defendant thereafter continued, unabated, in his execution of the cut-rag tobacco smuggling scheme.

Defendant also knew that the government was investigating another of his business associates when he was called to testify before the grand jury in March of 2016. Again, Defendant was not deterred from his participation in the scheme by this notice that law enforcement was looking into his affairs. Instead, he lied to the grand jury, and continued with his scheme.

Of course, learning about your co-conspirators being charged is not nearly so harrowing as being charged yourself. Yet, even being indicted was not enough to stop Defendant from committing crimes. Defendant was released on pre-trial supervision on January 23, 2019. Thereafter, while on pre-trial release for charges of, among other things, filing false tax returns, Defendant filed false 2017 and 2018 individual income tax returns, failing to fully report his income from his smuggling scheme. Being charged with a crime was not sufficient to deter Defendant from engaging in the exact same criminal behavior. A lengthy sentence is required to adequately deter him from future crimes.

## VI. <u>CONCLUSION</u>

An analysis of the § 3553(a) factors demonstrates that a sentence at the high end of the Guidelines is necessary to adequately meet the goals of sentencing. The government therefore respectfully suggests the Court sentence Defendant to that term of imprisonment, to be followed by a term of supervised release, with restitution

of $1,062,192 to be paid to the IRS.

Respectfully submitted,

G. NORMAN ACKER, III
Acting United States Attorney

By: */s/ Susan B. Menzer*
Susan B. Menzer
Assistant United States Attorney
Criminal Division
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Telephone: 919-856-4530
Email: susan.menzer@usdoj.gov
DC Bar No. 421007

*/s/ William Guappone*
William Guappone
Trial Attorney
U.S. Department of Justice
Tax Division
Southern Criminal Enforcement
150 M Street, NE, Room 1.1507
Washington, DC 20530
Telephone: 202-616-2378
William.Guappone@usdoj.gov
NC Bar No. 46075

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this 6th day of May, 2021, served a copy of the foregoing upon counsel for Defendant in this action via the CME/ECF.

By:   */s/ Susan B. Menzer*
SUSAN B. MENZER
Assistant United States Attorney
Criminal Division
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Telephone: 919-856-4530
Fax: 919-856-4487
Email: susan.menzer@usdoj.gov
DC Bar No. 421007